IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| FRED DANIELS and | ) | |
| GARRET DANIELS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-CV-668 |
| | ) | |
| CITY OF HARTFORD, | ) | (WO–Publish) |
| ALABAMA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Plaintiffs Fred and Garret Daniels, father and son, filed this action against Dale County, Alabama, Sheriff Wally Olson, Deputy Tim Byrd, Bryant Williams, the City of Hartford, Alabama, and Chief of Police Nick Finer on December 5, 2008. They seek to remedy alleged violations of rights protected by the Fourth and Fourteenth Amendments to the Constitution of the United States and alleged commission of various state common law torts. They allege, among other things, that the defendants arrested and detained them without probable cause and subjected them to unconstitutional conditions during their pretrial detention. The case is now before the Court on a Motion for Summary Judgment, which Defendants filed on March 19, 2009. (Doc. # 51.) The Court has carefully considered the lengthy briefs in support of and in opposition to the Motion, together with the applicable law. For the reasons set forth below, the Motion is due to be GRANTED.

## II. JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 because Plaintiffs' claims are pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and various state law torts. The parties do not contest venue and personal jurisdiction, and the Court finds a sufficient basis for each.

## III. LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed

2

to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23. Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the Court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV. FACTS AND PROCEDURAL HISTORY

Plaintiffs Fred Daniels ("Fred") and Garret Daniels ("Garret") claim that Defendants Sheriff Wally Olson ("Sheriff Olson") and Deputy Tim Byrd ("Deputy Byrd") arrested them, detained them, and subjected them to criminal judicial proceedings, all absent probable cause. They also allege that defendants Sheriff Olsen and Dale County, Alabama ("Dale County") violated their right to due process under the Fourteenth Amendment to the Constitution of the United States by subjecting them to unconstitutional conditions of pretrial

detention.[1]  Plaintiffs in the Amended Complaint assert claims against Sheriff Olsen both in his official capacity as Sheriff of Dale County, Alabama, and in his individual capacity. Plaintiffs sue Deputy Byrd in his individual capacity only.

Defendants categorically deny these allegations.  Sheriff Olsen and Deputy Byrd claim they are entitled to qualified immunity with respect to Plaintiffs' claims.  Dale County makes several arguments in opposition to the claims against it.  In accordance with their opposition, Defendants have moved for summary judgment in their favor on all claims. (Doc. # 51.)  Plaintiffs responded, and Defendants replied.[2]  The Motion is therefore under submission and ripe for disposition.  The Court has carefully considered all documents submitted in support of and in opposition to the Motion.  The submissions of the parties, viewed in the light most favorable to the nonmoving party, establish the following relevant facts:

Sheriff Olson and his deputies, including Deputy Byrd, arrested Fred and Garret on February 7, 2008. Deputy Byrd swore out the criminal complaint and arrest warrants for Fred

---

[1]The original Complaint listed three additional defendants: the City of Hartford, Alabama, Hartford Chief of Police Nick Finer, and Bryant ("Buddy") Williams.  The Court entered judgment in favor of the City of Hartford and Chief Finer by stipulation of the parties on September 30, 2008. (Doc. # 34.)  The Court dismissed Buddy Williams by stipulation of the parties on February 2, 2009. (Doc. # 50.)

[2]Defendants included in their reply a Motion to Strike. (Doc. # 54.)  The Motion is due to be granted with respect to newspaper articles, statements made by District Attorney Kirke Adams after the release of the Daniels men, and statements Garret made about what others told him after his release.  *See* Fed. R. Evid. 401, 402, 801, 802.  Additionally, the Court will only consider facts supported by record evidence pursuant to Federal Rule of Civil Procedure 56.  The Court makes no determination regarding the admissibility of these items at trial or in other proceedings, but rules only for purposes of the instant Motion.

and Garret on an alleged triple murder-for-hire the same day. He also swore out criminal complaints and arrest warrants for a conspiracy to commit assault. The complaints alleged that between November 1, 2007, and January 31, 2008, Fred and Garret conspired to commit murder-for-hire and assault-for-hire. The complaints named as targets of the murder-for-hire Ken Quattlebaum ("Judge Quattlebaum"), a local Circuit Judge,[3] Bryant Williams ("Buddy Williams"), a local attorney, and Sharmon Daniels ("Sharmon"), Garret's ex-wife. The target of the alleged assault was Tim Williams, the ex-husband of Fred's daughter and Garret's sister Denise. Sheriff Olsen and Deputy Byrd claim they had probable cause to believe Fred and Garret asked Drew Garner ("Garner"), an acquaintance of theirs, to contract for the murder and assault of these individuals. Sheriff Olsen claims he had probable cause to believe Garner followed through with the request and approached a confidential informant, Carl Sylvestry ("Sylvestry"), about the murders and assault. The undisputed facts Sheriff Olsen and Deputy Byrd were able to rely upon to support probable cause are as follows:

## A. *Daniels v. Daniels* Hearing and Initial Hartford Police Department Investigation

The facts that led to the arrest of Fred and Garret first came to light in a divorce proceeding before Judge Quattlebaum on January 30, 2008. The proceeding was an attempt by Buddy Williams to collect attorney's fees he incurred during the representation of

---

[3]Judge Quattlebaum is Circuit Judge for the 33rd Judicial Circuit of the State of Alabama, which includes Geneva and Dale Counties.

Sharmon, Garret's then-ex-wife, in the divorce of Sharmon and Garret.[4]  During the hearing, Buddy Williams represented to the court that Fred and Garret were suspects in a murder-for-hire conspiracy directed by them, and that Fred and Garret had contracted for the murder of Judge Quattlebaum, Sharmon, and Buddy Williams himself, and had contracted for the assault of Tim Williams, who was previously married to Fred's daughter Denise Williams.

Buddy Williams called Hartford Police Chief Nick Finer ("Chief Finer") to the stand during the hearing, and Chief Finer testified to the facts Buddy Williams had brought to the attention of the court.  He also testified to the following facts: Garner, an associate of Fred and Garret, approached a confidential informant, Sylvestry, and solicited the assault and murders for hire.  Sylvestry then contacted the Hartford Police Department, which arranged a meeting between Garner, Sylvestry, and an undercover policeman posing as a hit man.  The meeting between Garner, Sylvestry, and the undercover officer occurred on November 3, 2007.  At the meeting, Garner offered the undercover officer $1,000.00 to compensate him for the murders and assault, but the officer told Garner that amount was insufficient.  Garner and Sylvestry went to a body shop to collect more money.[5]  Once at the body shop, Garner exited the vehicle, leaving Sylvestry inside.  Garner returned to the vehicle, and Garner and

---

[4]Garret was married to Sharmon Daniels.  Denise Williams, daughter of Fred, was married to Tim Williams.  Buddy Williams represented both Tim Williams and Sharmon Daniels in their respective divorce proceedings against Denise and Garret, brother and sister and children of Fred.

[5]Fred and Garret own and operate a body shop, Daniels Paint and Body, but the testimony at the hearing did not specify which body shop Garner and Sylvestry went to when they  retrieved the additional money.

Sylvestry returned to meet the undercover policeman; Garner gave the policeman $2,000.00 additional dollars. Officer Mendiola, the undercover policeman, surreptitiously recorded his conversations with Garner.

Chief Finer also testified that, as of January 30, 2008, the date of the hearing, his office did not have any credible information linking Fred and Garret to the hit; Garner had refused to divulge the parties who requested the hit to the undercover officer and Sylvestry. Chief Finer also testified that "there's not enough strong evidence to build a case. If the evidence was there, they would have been charged." (Doc. # 1-2 23.) The Hartford Police did not undertake any investigation between the November set-up and the January 30, 2008, hearing.

### B. Subsequent Hartford Police Department Investigation and Statement of Carl Sylvestry

The Hartford Police Department re-opened their investigation after their November efforts became public at the *Daniels v. Daniels* hearing. Chief Finer and Lieutenant Gary Hughes ("Lieutenant Hughes") interviewed Sylvestry on January 31, 2008, the day after the hearing. Sylvestry's statement in the interview added details about what happened while he and Garner were at the body shop retrieving the additional money. Sylvestry claimed that when they pulled up they

SYLVESTER:[6]        . . . spoke to the fellow
HUGHES:            Which fellow?

---

[6]Sylvestry's name is misspelled in the transcript of this statement to the Hartford Police Department.

| | |
|---|---|
| SYLVESTER: | It was the husband that they were going through a divorce, and his father sat in the pickup truck. . . . Drew [Garner] and the husband spoke a little bit then they went over to the father . . . and they talked. |
| | And Drew eventually—they discussed what they had to discuss. The guy spoke to me briefly that he wanted to do it, but the heat was on him at that very particular time.  And he gave Drew some money and I believe he gave him—he gave him—I believe Drew had two thousand dollars of his money. |
| HUGHES: | You saw him give him that money? |
| SYLVESTER: | Yes |
| HUGHES: | Was it the husband or the father? |
| SYLVESTER: | The husband. |
| *** | |
| HUGHES: | Okay, you actually seen them— |
| SYLVESTER: | Yeah. |
| HUGHES: | —handed him the money? |
| SYLVESTER: | Yeah.  I was in my pickup truck sitting behind my wheel and they were parked maybe two car lengths away, but parallel . . . |

Hughes also told the officers that the hit was supposed to be against the subject's wife, a judge, and a lawyer, and the assault was supposed to be against the subject's brother-in-law.

### C. Dale County Sheriff's Investigation and Statement of Drew Garner

Sheriff Olsen arrested Garner on February 4, 2008.  The Sheriff and his deputies took a videotaped statement from Garner two days later.  Because Sheriff Olsen and Deputy Byrd claim conduct and statements of Garner served as the main impetus for the arrest of Fred and Garret, some of Garner's testimony is worth setting out in full:

| | |
|---|---|
| [Deputy] BYRD: | . . . start from the beginning and tell us how it happened? |
| GARNER: | Yes, sir.  With this particular—what we're talking about here, Fred Daniels and Garret Daniels approached me wanting to know if I could do something for them. . . . They had contacted me again and they said they were having issues with the ex-wife, being Sharmon Daniels, then issues with Tim Williams, |

| | |
|---|---|
| | and issues with the Judge.  I believe Quattlebaum is the Judge over the case, and Buddy Williams who was the attorney for Tim Williams and Sharmon Daniels.  And they wanted to know if I would get things made—done for them.  And I said, "Well— |
| BYRD: | Things being done is what specifically? |
| GARNER: | Things being done as in a hit being put on those three individuals, and they wanted Tim Williams beat up is what their strong indications were.  Because I mean Fred approached me many times on this and he walked up straight faced to me and he's come to me very bold, very brash, very just—"This is what I want done". |
| UNKNOWN: | Well, why don't you tell what they want done. |
| GARNER: | That these three murders to happen. |

Garner also stated that he told Fred and Garret that he knew someone who could take care of the hit, and they said that he "would be well taken care of" if he could make the hit happen for them.  Garner claimed that Garret gave him the $1,000.00 that he initially took to Sylvestry for the hit.  Garner also corroborated Sylvestry's account about the trip to get additional funds, in particular that Sylvestry and Garner went to the body shop to meet Garret, and that Garret gave the additional funds to Garner, who gave them in turn to Sylvestry.  He also corroborated Sylvestry's statement that Garret passed the money and that Fred remained in the truck.  In fact, Garner verified the amounts and said that Garret handled both the transactions personally.[7]  He also responded to the question "So, what you're telling me is that you willingly conspired to kill three people and mame [sic] another one for Fred and Garret Daniels?" with "Yes, sir."

---

[7]Garner stated that Garret initially gave Sylvestry $2,000.00, but that Sylvestry skimmed $1,000.00 before giving it to the undercover officer, and that the second delivery was also for $2,000.00.  He also verified the denomination—hundred dollar bills.

Garner's statement also provided the motive for the alleged murders-for-hire:

BYRD:           Right.  Did they tell you why?
GARNER:      Well, because they felt like they were being jilted in
                    Court, and that it was all one-sided against them, and if
                    the murders happened and these people went away, then
                    the could have I guess a new Judge sit in on it, a new
                    attorney for Sharmon Daniels sit in on it.
BYRD:           What about Tim Williams? Why did they just want to beat
                    him up?
GARNER:      He is Denise Daniels's ex-husband and he used Buddy Williams
                    for the divorce between Denise and Tim himself.  So, he caused
                    them an extreme amount of pain, from what I'm understanding.

Garner also provided additional background information:  Garner is a close associate

of Fred and Garret and would sometimes do investigative work, such as following people,

do odd jobs, or run errands for them.  Garner lived rent free in a residence on the property

of Daniels Paint and Body, an automobile body shop owned and operated by Fred and Garret.

He told Deputy Byrd that Fred and Garret wanted to eavesdrop on the phone calls of a lawyer

and Tim Williams.  He also claimed that about two years before the alleged murder-for-hire,

Fred and Garret asked him to have a drug dealer plant drugs in Tim Williams' car so they

could set him up, with the ultimate goal of wresting custody of Tim and Denise's children

from him in favor of Denise.  Garner also claimed that he went through with the set-up by

calling the Dothan Police and telling them about the existence and location of the planted

drugs.  He also testified that once previously Fred paid him two hundred dollars to poison

Tim Williams's "high-dollar cows," though Garner did not poison the cows.

## 2. Statement of Officer Mendiola

Officer Mendiola, the undercover officer who posed as the hit man, drafted a

statement on February 13, 2008, after the arrest of Fred and Garret.  Officer Mendiola corroborated many of the facts offered by Garner and Sylvestry, though he was not able to link Garret and Fred to the alleged conspiracy, as he did not accompany them to get the additional funds.  He did corroborate the outlines of the plan and the designated victims.

### D. Other Background Information

Defendants devote eighteen of twenty-five pages of their statement of undisputed facts to "Plaintiffs' Personalities, Reputation, Motives & Patterns of Behavior." (Doc. # 51 p. 8.) Reproducing all of this information would be impractical here, and much of it is irrelevant, but a brief summary of the undisputed facts is in order.

Deputy Byrd claimed that prior involvement of Fred and Garret in the legal system was consistent with the triple murder-for-hire and assault-for-hire scheme.  For instance, Sheriff Olsen signed an "I/O report" regarding alleged harassment of Sharmon Daniels by Fred and Garret.  Various members of the Dale County Sheriff's Department had prior knowledge of Garner at the time of these events.  Deputy Byrd thought it unlikely that Garner had ready access to much cash, saying "Drew Garner didn't have $3,000.00 laying around."

Judge Quattlebaum was the presiding judge in several cases involving members of the Daniels family, including two divorce cases, *Williams v. Williams*, and *Daniels v. Daniels.* Judge Quattlebaum took child custody from a member of the Daniels family in each of these cases.  Judge Quattlebaum granted Tim Williams, Denise's ex-husband, full custody, required Denise to attend anger management classes, held her in contempt, and ordered her to pay $7,500.00 in attorney's fees. Judge Quattlebaum also entered findings of harassment,

threats, and intimidation of Sharmon by Garret in *Daniels v. Daniels*.  Judge Quattlebaum also entered a Temporary Restraining Order against Fred and Garret, which prohibited them from harassing Sharmon Daniels, among others.  Fred and Garret sought recusal of Judge Quattlebaum on various occasions.  Judge Quattlebaum issued protection orders against Fred and Garret related to an ongoing dispute between them and owners of neighboring property.

### C. Conditions at the Dale County Detention Facility

Fred and Garret were incarcerated at the Dale County Detention Facility for fifty-eight and sixty-nine days.  Fred and Garret make multifarious complaints about the jail.  Many examples follow.

Fred and Garret underwent strip searches in front of one another.  Corrections officers would taunt prisoners with sexual comments about the prisoners' wives or girlfriends.  Garret claims corrections officers ignored his complaints about a cracked tooth and neck problems.  Both men claim mail from their attorneys was opened outside their presence, simply marking the mail "opened but not read."

Fred was tortured by the sound of TV, which was left on in the cell block from 5:30 a.m. to 10:30 p.m.  Fred's ears still hurt from listening to the TV and trying to plug his ears with toilet tissue.  Fred once asked for ear plugs and was never given any. Fred claims he went for as many as six days without a shower.  There were sometimes as many as twenty-five inmates in the shower at once.  The showers went up to three weeks between cleanings.  Garret was denied adequate access to fingernail clippers and sometimes ran out of toilet paper

There were no sheets or linens in the cells, except for a blanket that was four feet by six feet. There was a vinyl mattress in Fred's cell approximately one inch thick, but there was no pillow.  Garret was made to sleep on a mattress other inmates slept on previously. Garret claims that his cell was alternately uncomfortably hot and insufferably cold.  Fred was cold while in the cell.  The toilet in Fred's cell overflowed while he was in the cell.  The sewage from the toilet would collect under his bed and he had to use his shower shoe to squeegee it out of his cell under the cell door.  A plumber worked on the problem at least three times, but said it was not reparable because a subterranean pipe that was inaccessible was broken.  The roof was leaking water into the cell block.   Inmates were in their cells twenty-plus hours per day and phone access was available only from 6 to 7 a.m., 11 a.m. to 1 p.m., and from 5 to 6 p.m.

Garret suffered an injury to his neck and a staph infection.  Fred claims his medicine frequently was not given to him.  Fred and Garret were both affected by overspray of pepper spray when correction officers sprayed other inmates in other cells and once had to put his head in the cell toilet to stop the burning. Both men lost over twenty pounds while in jail. The food was cold and out of date.  The food was pathetic and included cold balogona and grits.

Fred and Garret wrote complaints about the situation in the jail.  Garret claims he wrote six complaints, but that only one was produced by defendants in discovery.   Fred claims to have submitted three complaints.  Fred and Garret do not claim, and there are not facts to show, that Sheriff Olsen knew about any of these conditions.

## V. DISCUSSION

The parties dispute the legal import of, and inferences to be drawn from, many facts in this case. The relevant underlying facts, however, are largely undisputed, having been recorded, transcribed, or contemporaneously memorialized. Upon careful consideration of the undisputed facts, the Court finds: (1) that the state law claims are due to be dismissed by stipulation of the plaintiffs; (2) that any official capacity claims against Sheriff Olsen are due to be dismissed; (3) that defendants Sheriff Olsen and Deputy Byrd acted with probable cause to believe Fred and Garret conspired to commit a triple-murder- and assault-for-hire and are therefore protected from suit by qualified immunity; and (4) that Sheriff Olsen is protected from the claims that seek redress for conditions of pretrial confinement by the doctrine of qualified immunity and Plaintiffs have not made out a colorable claim against defendant Dale County.

### A. State Law Claims

The Amended Complaint contains several state law claims: Count III for trespass, Count IV for assault and battery, Count V for felonious injury, Counts VI and VII for slander per se, Count VIII for invasion of privacy, Count IX for intentional infliction of emotional distress, and Count X for outrage. Defendants argue in their Motion for Summary Judgment that state sovereign immunity bars these claims. Plaintiffs "have chosen not to advance [these] independent state law claims." (Doc. # 53.) Therefore, Counts III through X are due to be dismissed.

### B. Official Capacity Claims Against Sheriff Olsen

14

Plaintiffs purport in the Amended Complaint to sue Sheriff Olsen both in his official capacity as Sheriff of Dale County, Alabama, and in his individual capacity. To the extent there were claims against Sheriff Olsen in his official capacity asserted in the Amended Complaint that Plaintiffs have not explicitly abandoned, Plaintiffs have abandoned them because the response to the Motion for Summary Judgment failed to address these claims. *See Walton ex rel. R.W. v. Montgomery County Bd. of Educ.*, 2005 WL 1217256, *4 (M.D. Ala. May 20, 2005) (Albritton, J.) (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). "[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution Trust Corp.*, 43 F.3d at 599. Accordingly, as Plaintiffs do not rely upon these claims in summary judgment, they are deemed abandoned.[8]  Therefore, Summary Judgment is due to be granted as to the official capacity claims against Sheriff Olsen and those claims are due to be dismissed.

### C. False Arrest, False Detention, and Malicious Prosecution Claims Against Sheriff Olsen and Deputy Byrd in Their Individual Capacities

Fred and Garret complain that they suffered a false arrest in violation of the Fourth Amendment. "Under the Fourth Amendment, an individual has a right to be free from 'unreasonable searches and seizures' . . . [and] an arrest is a seizure of the person." *Skop v.*

---

[8]The Court also notes that it is well established that claims against a County Sheriff in Alabama are barred by the Eleventh Amendment.  *E.g., Harbert Inter., Inc. v. James*, 157 F. 3d 1271, 1277-78 (11th Cir. 1998) (holding that state officials are entitled to the Eleventh Amendment immunity of the state because the state is the real party in interest.).

*City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007); *accord Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009).  The "reasonableness" of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause.  *Id.*; *see also Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) ("The existence of probable cause at the time of arrest . . . constitutes an absolute bar to a section 1983 action for false arrest."); *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003); *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)).  Fred and Garret also advance a claim of false imprisonment, which, because it is derivative of the false arrest claim, also depends on an absence of probable cause.  *Case*, 555 F.3d at 1330 ("Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under section 1983 for false imprisonment based on a detention pursuant to that arrest.") (quoting *Ortega*, 85 F.3d at 1527).  Finally, Fred and Garret bring a claim of malicious prosecution, which arises from the use of judicial processes in connection with the events that let to this lawsuit.  The Eleventh Circuit has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983, and an essential element of the claim is the absence of probable cause.  *Wood v. Kessler*, 323 F.3d 872, 881 (11th Cir. 2003); *Uboh v. Reno*, 141 F.3d 1000, 1002-04 (11th Cir. 1998); *see also Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831-32 (Ala. 1999).  Thus, the false arrest, false imprisonment, and malicious prosecution claims share one common element: they all require proof of the absence of probable cause.

In support of their Motion for Summary Judgment, Sheriff Olsen and Deputy Byrd

contend that Plaintiffs have failed to present evidence of the lack-of-probable-cause element of each of these claims, an element on which Plaintiffs bear the ultimate burden of persuasion.[9]  More specifically, as to these claims against them in their individual capacities, Sheriff Olsen assert that they are entitled to the protection of qualified immunity.

### 1. Qualified Immunity, Probable Cause, and Arguable Probable Cause

Qualified immunity shields a Section 1983 defendant from liability for harms arising from discretionary acts, as long as the discretionary acts do not violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow*, 457 U.S. at 818); *Case*, 555 F.3d at 1327; *Draper v. Reynolds*, 369 F.3d 1270, 1275 (11th Cir. 2004).  An officer may raise this shield through a motion for summary judgment on the ground that he is entitled to qualified immunity.  *Shaw v. Coosa County Comm'n*, 434 F. Supp. 2d 1179, 1190 (M.D. Ala. 2008) (Fuller, C.J.) (quoting *Crosby v. Monrow County*, 394 F. 3d 1328, 1332 (11th Cir. 2004)).

_____

[9]A plaintiff in an action under § 1983 asserting a claim for unlawful arrest bears the burden at trial of showing an absence of probable cause. *Rankin*, 133 F.3d at 1436; *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir. 1997) ("In order to establish a Fourth Amendment violation, [plaintiff] must demonstrate that a seizure occurred and that it was unreasonable."); *Shortz v. City of Montgomery*, 267 F. Supp. 2d 1124, 1127 (M.D. Ala. 2003) (Thompson, J.); *see also Rivas v. Freeman*, 940 F.2d 1491, 1496 (11th Cir. 1991) ("To successfully litigate a lawsuit for deprivation of constitutional rights under 42 U.S.C. section 1983, a plaintiff must show violation of a constitutionally protected liberty or property interest and deliberate indifference to constitutional rights.").   The allocation of this burden is not different at the summary-judgment stage. *See, e.g.*, *Fitzpatrick v. City of Atlanta*, 2 F. 3d 1112, 1115-17 (11th Cir. 1993).

Sheriff Olsen and Deputy Byrd argue in their Motion for Summary Judgment that they are entitled to qualified immunity.

To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. *Crosby*, 394 F. 3d at 1332; *Shaw*, 434 F. Supp. 2d at 1190. It is "not disputed that the Defendants Olsen and Byrd acted within the scope of their discretionary authority when the wrongful acts occurred." (Doc. # 53 p. 23.) Consequently, Fred and Garret bear the burden of demonstrating that Deputy Byrd and Sheriff Olsen are not entitled to qualified immunity. *Crosby*, 394 F.3d at 1332; *Shaw*, 434 F. Supp. 2d at 1190. In order to satisfy this burden, Fred and Garret must show two things: (1) that the defendants committed a constitutional violation and (2) that the constitutional right the defendants violated was "clearly established." *Crosby*, 394 F.3d at 1332.

In the context of qualified immunity cases that turn on the presence or absence of probable cause, an official has not committed a clearly established constitutional violation if either actual or arguable probable cause existed. *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). In other words, qualified immunity protects Sheriff Olsen and Deputy Byrd if either (1) actual probable cause existed, or (2) arguable probable cause existed. Because Fred and Garret bear the burden of proving qualified immunity does not apply, they must prove *both* that actual probable cause did not exist, and that arguable probable cause did not exist. *Rankin*, 133 F.3d at 1436; *Evans v. Hightower*, 117 F.3d 1318, 1320 (11th Cir. 1997); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993); *Shortz v. City of*

18

*Montgomery*, 267 F. Supp. 2d 1124, 1127 (M.D. Ala. 2003) (Thompson, J.).

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Case*, 555 F.3d at 1327 (citing *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992)). "[P]robable cause requires only a probability or substantial chance of criminal activity, *not an actual showing of such activity.*" *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983)) (emphasis added). "Probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'" *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (quoting *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990)). Probable cause must be assessed "not with clinical detachment but with a common sense view to the realities of normal life." *Wilson v. Attaway*, 757 F.2d 1227, 1235 (11th Cir. 1985). One particular application of this commonsense view is that a reviewing court may "examine the collective knowledge of law enforcement officers if they maintained at least a minimal level of communication during their investigation." *United States v. Willia*, 759 F.2d 1486, 1494 (11th Cir. 1985).

The probable cause determination is an objective one. *Lee*, 284 F.3d at 1188; *Rankin v. Evans*, 133 F.3d 1425, 1433 (11th Cir. 1998) ("This Circuit has concluded that the standard for determining the existence of probable cause is the same under both Florida and federal law—whether 'a reasonable man would have believed [probable cause existed] had he known all of the facts known by the officer.'"); *see also Wren v. United States*, 517 U.S.

19

806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").  "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier*, 533 U.S. at 201.

As explained above, an officer need only have arguable probable cause, not actual probable cause, in order to qualify for immunity from a Fourth Amendment claim. *See Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997). "Arguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest.' " *Lee*, 284 F.3d at 1195. Qualified immunity thereby protects officers who "reasonably but mistakenly conclude that probable cause is present." *Montoute*, 114 F.3d at 184 (quotation marks and citation omitted). "Thus, the qualified immunity standard is broad enough to cover some mistaken judgment, and it shields from liability all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation marks and citation omitted).

### 2. Analysis

Fred and Garret assert three closely related claims, which arise from various facets of their arrest and detention by Defendants.  The claim for false arrest is a colloquially named claim for unreasonable seizure in violation of the Fourth Amendment to the Constitution of the United States, as applied to the states via the Fourteenth Amendment. *Skop*, 485 F.3d at 1137; *Case*, 555 F.3d at 1326.  A seizure is unreasonable only if carried out in the absence of probable cause. *Id.*  The false imprisonment claim is founded on the Fourteenth

Amendment protection against deprivation of liberty without due process of law.  Courts have held that incarceration subsequent to arrest is a deprivation of liberty without due process of law when the arrest was made in the absence of probable cause. *Case*, 555 F.3d at 1330.  Similarly, the constitutional claim for malicious prosecution under the Fourth Amendment requires proof of, among other things, absence of probable cause.  *Wood*, 323 F.3d at 881 Because the existence or non-existence of probable cause to arrest Fred and Garret is a common element to these three claims, and because the parties focus on whether probable cause existed, the Court takes up the issue of probable cause first.  Because Defendants have asserted the defense of qualified immunity, their Motion is due to be granted if Plaintiffs fail to demonstrate both that actual probable cause did not exist and that arguable probable cause did not exist.  After careful consideration of the voluminous evidence submitted in support of and in opposition to the motion for summary judgment and the applicable authorities, the Court finds that Sheriff Olsen and Deputy Byrd had actual probable cause to arrest, detain, and charge Fred and Garret.

For purposes of the instant motion, the issue is whether the defendants had probable cause to believe Fred and Garret committed a violation os Alabama Code § 13A-4-3, which makes criminal conspiracies illegal in the State of Alabama.[10]  Thus, Plaintiffs must show

---

[10]Section 13A-4-3 provides in part:

(a) A person is guilty of criminal conspiracy if, with the intent that conduct constituting an offense be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one or more of such persons does an overt act to effect an objective of the agreement.

that Sheriff Olsen and Deputy Byrd lacked actual probable cause and arguable probable cause to believe (1) Fred and Garrett harbored the specific intent that the alleged targets of the murder and assault for hire be murdered and assaulted; (2) Fred and Garrett agreed with Garner or another co-conspirator (or among themselves) that the murders and assault be carried out; and (3) there was an overt act taken by one of the conspirators in furtherance of the conspiracy. Ala. Code § 13A-4-3; *Greer v. State*, 563 S. 2d 39, 40 (Ala. Crim. App. 1990). Or alternately, the question for purposes of this Motion is whether Sheriff Olsen and Deputy Byrd had probable cause to believe these elements were satisfied.

Sheriff Olsen and Deputy Byrd claim they thought probable cause existed to arrest Fred and Garret based on several categories of information. First among them is the file compiled by the Hartford Police Department. The Hartford Police, led by Chief Finer, conducted an investigation into the alleged murder and assault-for-hire conspiracy in late 2007. Chief Finer initiated that investigation when Sylvestry approached one of his officers with information that Garner had solicited his participation in a triple murder and assault for

---

(b) If a person knows or should know that one with whom he agrees has in turn agreed or will agree with another to effect the same criminal objective, he shall be deemed to have agreed with such other person, whether or not he knows the other's identity.

(c) A person is not liable under this section if, under circumstances manifesting a voluntary and complete renunciation of his criminal purpose, he gave a timely and adequate warning to law enforcement authorities or made a substantial effort to prevent the enforcement of the criminal conduct contemplated by the conspiracy. Renunciation by one conspirator, however, does not affect the liability of another conspirator who does not join in the abandonment of the conspiratorial objective. The burden of injecting the issue of renunciation is on the defendant, but this does not shift the burden of proof.

hire.   In response, the Hartford Police orchestrated an undercover operation to gather information.  Part of that operation involved having an undercover officer (Officer Mendiola) pose as a hit man from New York who Sylvestry was to present to Garner as the man for his job.  This operation in fact occurred, and Officer Mendiola surreptitiously recorded his conversations with Garner.  Garner passed $3,000.00 in $100.00 bills to Mendiola that night as a down payment on the hits.  All of this information was in the possession of Deputy Byrd and Sheriff Olsen at the time of the arrest, detention, and prosecution of arrest warrant for Fred and Garret Daniels.   This information provided probable cause that a conspiracy involving Garner existed, but, based on this information alone, law enforcement lacked probable cause to believe Fred and Garret were involved.

Plaintiffs thus make much of Chief Finer's statement at the *Daniels v. Daniels* hearing that, as of that date, his office did not have any credible information linking Fred and Garret to the conspiracy.  However, that connection was later established by a statement Sylvestry made to the Hartford Police on January 31, 2008.  In that interview, which was prior to the arrest of Fred and Garret but after the hearing, Sylvestry testified that he saw "the husband and they were going through a divorce" (rather than "the father") give Garner the money that was then given to Officer Mendiola as a down payment on the hit.  He also stated that he actually saw "the husband" hand Garner the money while "the father" sat in a pickup truck.  Sylvestry also stated that he was able to clearly see both men and that Garner spoke to both men.  Plaintiffs question whether the contents of the Sylvestry interview were known to Sheriff Olsen and Deputy Byrd at the time of the arrest.  But taking a commonsense view of

23

the situation, and in light of the communication between the Hartford Police and the Dale County Sheriff's office throughout the prosecution of this case, the Court is free to, and will, examine the collective knowledge of law enforcement officers. *Willia*, 759 F.2d at 1494 (holding that courts may examine the collective knowledge of law enforcement officers when there was at least minimal communication between them); *Wilson*, 757 F.2d at 1235 (requiring courts to take a commonsense view of probable cause determinations).

In addition to the Hartford Police Department file, Defendants rely heavily on the statement of Garner to support probable cause, particularly with respect to establishing a link between Fred and Garret and the murder and assault for hire conspiracy. Sheriff Olsen arrested Garner on February 4, 2008, and took a videotaped statement two days later. In the course of that statement, Garner stated directly: "Fred Daniels and Garret Daniels approached me wanting to know if I could do something for them . . . as in a hit being put on [Sharmon Daniels, Buddy Williams, and Judge Quattlebaum]." This testimony corroborates that of Sylvestry. Garner also responded affirmatively to the question: "So, what you're telling me is that you willingly conspired to kill three people and mame [sic] another one for Fred and Garret Daniels." These statements alone are sufficient to establish probable cause to arrest the Daniels men. *See Craig v. Sincletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (*en banc*) ("For the past forty years, an unbroken stream of precedent in this circuit has established that the uncorroborated testimony of a co-conspirator or accomplice is sufficient to prove guilt beyond a reasonable doubt. . . . It would be anomalous for us to hold that even though a codefendant's uncorroborated testimony can prove guilt beyond a reasonable doubt, the

24

confession of a co-defendant that he and the suspect committed the crime is insufficient to establish probable cause.")

Fred and Garret vigorously contest the trustworthiness of Garner's statement, arguing that what Garner says is of dubious value and therefore cannot be used to support probable cause. In determining whether an informant's tip rises to the level of probable cause, a court must assess the totality of the circumstances. *Ortega*, 85 F.3d at 1525. The court should consider the relevance of factors such as corroboration of the tip through independent police work, whether the informant has made a statement against his penal interest, whether the informant had personal knowledge, and whether there is a history between the informant and the police department that supports his reliability. *Id.* (citations omitted). Garner's statement was sufficiently reliable to support probable cause. First, open and unequivocal admission of his involvement in a murder-for-hire conspiracy was directly adverse to Garner's penal interest. Second, the facts he relayed were corroborated by statements Sylvestry made in the course of the Hartford Police Department investigation about the "husband" and "father" co-conspirators. Third, Garner, as a co-conspirator of Fred and Garret, had personal knowledge of the facts he shared with law enforcement. Finally, while Fred and Garret point to numerous uncorroborated assertions of fact in Garner's statement, the Eleventh Circuit has held that even an uncorroborated statement of a co-conspirator can suffice to establish probable cause, so long as the confession is not "outlandish on its face." *Sincletary*, 127 F.3d at 1042 (explaining "outlandish on its face" by example: "the confession of a mental patient that he and the suspect, aided by an army of little green men, committed the crime clearly

would not pass muster.").  In other words, Garner's statement was "reasonably trustworthy information." *Ortega*, 85 F.3d at 1525.

Supporting the claims of Sylvestry and Garner with respect to the presence of the Daniels men at the meeting with the undercover officer and their statements that Garret was the source of the funds exchanged at that meeting, was the information from several quarters about Fred and Garret's motive and the circumstances that linked the alleged victims to Fred and Garret.  First, Garner detailed Fred and Garret's motives in his statement to Sheriff Olsen on February 6, 2008.  He stated that the Daniels men "felt they were being jilted in court, and that it was all one-sided against them, and if the murders happened and these people went away, then they could have I guess a new Judge sit in on it, a new attorney for Sharmon Daniels sit in on it."  He also stated that they wanted Tim Williams beat up because he had caused pain to Fred's daughter (Garret's sister) Sharmon when he (Tim Williams) and Sharmon divorced.  Garner also provided details of an ongoing effort by the Daniels men to harass Tim Williams by, among other things, framing him for possession of illegal drugs and poisoning his livestock.  Sheriff Olsen also knew of prior harassment of Sharmon by the Daniels men. Sheriff Olsen knew the Garret men were connected in a unique way with the alleged victims. Sheriff Olsen also knew the reputation of the Daniels men in the community and thought the alleged murder for hire conspiracy was consistent with their past behavior. Consideration of the Daniels' reputation by Sheriff Olsen is a commonsense approach to understanding how probable cause determinations can be made in rural Alabama counties. *See United States v. Harris*, 403 U.S. 573, 583 (1971) (holding that a law enforcement

officer's knowledge of a suspect's reputation for engaging in criminal activity may properly be considered by those assessing probable cause); *United States v.* Farese, 612 F.2d 1376, 1379 n.5 (11th Cir. 1980) (same); *Wilson*, 757 F.2d at 1235 (directing courts to assess probable cause "not with clinical detachment but with a common sense view to the realities of normal life").

Fred and Garrett also argue that Sheriff Olsen and Deputy Byrd did not undertake a reasonable investigation.   An arresting officer is required to conduct a reasonable investigation to establish probable cause. *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (citing *Tillman*, 886 F.2d at 321).   However, based on the foregoing, including the information in the Hartford Police Department file, the Court finds that the investigation was in fact reasonable and managed to amass substantial evidence in support of probable cause. Additionally, Fred and Garret bring attention to the winding down of the case against them, including statements and actions of the District Attorney.   The focus particularly on the dismissal of the charges.   But the decision of the District Attorney to drop charges against them is of no import.   When determining the validity of an arrest, "[t]hat a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence . . . ." *Marx*, 905 F.2d at 1507; *see also Shortz*, 267 F. Supp. 2d at 1128-29 (plaintiff's reliance on dismissal of charges to support contention that officers lacked probable cause to arrest him was misplaced; decision to dismiss charges did not mean that decision to arrest lacked legal basis).

The foregoing undisputed facts establish that Sheriff Olsen and Deputy Byrd had

27

actual probable cause to arrest Fred and Garret and are entitled to qualified immunity.  Even if the Court assumed, *arguendo*, that they (and the magistrate) erred in concluding that probable cause existed to arrest Fred and Garret, Sheriff Olsen and Deputy Byrd nevertheless would be entitled to qualified immunity because they had arguable probable cause to believe Fred and Garret committed the crimes charged; their decision was reasonable, even if mistaken. *See Hunter v. Bryant*, 502 U.S. 224, 228-29 (1991) (citing *Anderson*, 483 U.S. at 641); *Lee*, 384 F.3d at 1195; *see Crosby*, 394 F.3d at 1332  The qualified immunity standard gives ample room for mistaken judgments by protecting "all but the plainly incompetent of those who knowingly violate the law." *Id.*

The undisputed facts detailed above are "sufficient to warrant a reasonable belief" that Fred and Garret participated in the alleged conspiracy. *See Case*, 555 F.3d at 1327. Therefore, Sheriff Olsen and Deputy Byrd are shielded from suit by the doctrine of qualified immunity and summary judgment is due to be entered in their favor with respect to the false arrest, false imprisonment, and malicious prosecution claims.  Accordingly, those claims are due to be dismissed.

### C. Conditions of Confinement

Defendants assert claims against Dale County and Sheriff Olsen pursuant to § 1983 because they claim the conditions of their pretrial confinement violate the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment protects pretrial detainees. *See Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). The Eleventh Circuit Court of Appeals has held that "in regard to providing pretrial detainees with such basic

28

necessities as food, living space, and medical care the minimum standard allowed by the due

process clause is the same as that allowed by the Eighth Amendment to convicted persons."

*Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994) (quoting *Hamm v.*

*DeKalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985)).

The Eighth Amendment proscribes the infliction of cruel and unusual punishment.

U.S. Const. amend. VIII. This prohibition extends beyond physically barbarous punishment

and includes inhumane conditions of confinement, which is what Fred and Garret complain

of here. *See Ort v. White*, 813 F.2d 318, 321 (11th Cir. 1987).  Fred and Garret direct their

conditions of confinement claims against an individual, Sheriff Olsen, and a municipality,

Dale County.  There are two essential components to an Eighth Amendment claim brought

against an individual: one objective, the other subjective. *See Helling v. McKinney*, 509 U.S.

25, 35 (1993) (noting that, on remand, the plaintiff would have "to prove both the subjective

and objective elements necessary to prove an Eighth Amendment violation"). First, the

alleged deprivation must be objectively serious. *See Farmer v. Brennan*, 511 U.S. 825, 834

(1994).  The second, subjective component of the analysis requires that the inmate caretaker

must have had a sufficiently culpable state of mind at the time of the alleged violation. *Id.*

In prison-condition cases like this one, the required state of mind is "deliberate indifference"

to inmate health or safety. *See id*. In defining deliberate indifference in this context, the

Supreme Court has determined that "a prison official may be held liable under the Eighth

Amendment for denying humane conditions of confinement only if he knows that inmates

face a substantial risk of serious harm and disregards that risk by failing to take reasonable

measures to abate it." *Id.* at 847. A plaintiff must also prove that a Defendant's disregard of the risk is more than negligent. *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).

The subjective component is different when conditions of confinement claims are directed at municipalities. *See id.* at 840-41. For municipalities such as Dale County, deliberate indifference must be measured under an objective approach that does not account for actual disregard of known risks. *See id.* at 841. The use of an objective standard is necessary because it is not possible for a municipality, an artificial entity, to have subjective intentions. *See id.* Under the objective approach, the inquiry is whether there were substantial risks present which were "so obvious" that the municipality "can reasonably be said to have been deliberately indifferent to the need." *See City of Canton v. Harris*, 489 U.S. 378, 396 (1989).

### A. Sheriff Olsen

Fred and Garret make numerous claims against Sheriff Olsen arising from the conditions of detention at the Dale County Detention Facility. They erect their theory of liability on a claim that Sheriff Olsen failed to adequately train the corrections officers at the jail on numerous aspects of prisoner detention. To succeed on this claim, Fred and Garret must to show that Sheriff Olsen knew that they or other similarly situated inmates faced a substantial risk of serious harm because of inadequately trained jail personnel, but disregarded that risk by failing to take reasonable measures to abate it. *See Farmer*, 511 U.S. at 837. Fred and Garret must also show a causal connection between Sheriff Olsen's failure and the constitutional deprivation. *See Belcher*, 30 F.3d at 1396-97.

Sheriff Olsen's qualified immunity with respect to the wrongful arrest and detention of the Daniels men was discussed fully above. A brief discussion with respect to his supervision of the jail is in order here. To be eligible for qualified immunity, a defendant must first demonstrate that he was a public official acting within the scope of his discretionary authority. *See Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988). Plaintiffs concede that Sheriff Olsen was acting within the scope of his discretionary authority during times relevant to the allegedly wrongful arrest and detention, but it is not clear they concede the point for purposes of Sheriff Olsen's supervision of the Dale County Detention Facility. However, courts have uniformly held that supervision of a jail and training of corrections of officers is an activity within the discretionary authority of a County Sheriff in Alabama. *See Shaw*, 434 F. Supp. 2d at 1179 (" It is clear that setting policies and procedures regarding . . . training for jail staff, and other policies relating to the jail administration challenged in this lawsuit were squarely within [defendant's] job responsibilities as Sheriff of Coosa County."); *Vinson*, 10 F. Supp. 2d at 1297-98; *see also Slaughter v. Dooly County*, No. 5:06-CV-143, 2007 WL 2908648 *14 (M.D. Ga. Sept. 28, 2007 ) (holding that under Georgia law "enactment of jail policies and the training and supervision of employees are clearly discretionary acts."); *Adams v. Franklin*, 111 F. Supp. 2d 1255, 1267 (M.D. Ala. 2000) (DeMent, J.) (holding that deputy sheriffs, as alter-egos of the Sheriff, were acting within the scope of their discretionary authority when they made decisions regarding incarceration, including whether and how to administer medical care). Thus, Fred and Garret bear the burden of demonstrating: "(1) that the defendant has

31

committed a constitutional violation and (2) that the constitutional right the defendant violated was 'clearly established' at the time he did it." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).

Plaintiffs have the burden of demonstrating that Sheriff Olsen's failure to train jail personnel amounted to a violation of clearly established law. *See Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994). If they fail to meet this burden, qualified immunity shields Sheriff Olsen from suit.  Fred and Garret rely on one case, *City of Canton v. Harris*, 489 U.S. 378 (1989), which stands for the proposition that "'failure to train' can be the basis for liability under § 1983" in certain circumstances.  *Id.* 387.  The definition of deliberate indifference for purposes of claims such as those raised in this lawsuit has been clarified through a series of lawsuits. In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court established that deliberate indifference was the applicable standard. *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999).  Nearly twenty years later, the Supreme Court further clarified the meaning of "deliberate indifference" in *Farmer v. Brennan. Id.* The Supreme Court held that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. Thus, "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more

than mere negligence." *McElligott*, 182 F.3d at 1255. The Eleventh Circuit Court of Appeals has explained that summary judgment must be granted for the defendant official unless the plaintiff presents sufficient evidence from which a reasonable jury could find that the official had subjective knowledge of the relevant risk and disregard of that risk by conduct that is more than mere negligence, but it has acknowledged that such evidence may be circumstantial. *See, e. g.*, *McElligott*, 182 F.3d at 1255; *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999).

This standard sets a difficult burden for plaintiffs. Most critically, in order to survive a motion for summary judgment, they must present evidence that Sheriff Olsen had subjective knowledge of the risk that they would be subject to the conditions they complain of,[11] and that he ignored that risk, and did so by more than mere negligence. The record is bereft of information about Sheriff Olsen's subjective state of awareness regarding the prison conditions they complain of.

Fred and Garret argue that deliberate indifference is evidenced by the following: (1) that Defendants never trained jail corrections officers as to the policies and procedures applicable to jailers, specifically regarding treatment of legal mail; (2) that inmates were tazed and sprayed with aerosol spray inside their cells; (3) that corrections officers used sexually charged language regarding inmates' girlfriends and wives; and (4) that basic

---

[11]The Court assumes, without unnecessarily deciding, the dubious legal conclusion that the conditions Fred and Garret complain of constitute a "serious harm" for purposes of the deliberate indifference standard such that Sheriff Olsen's deliberate disregard of the risk that they would be subjected to those conditions would be unconstitutional.

provisions were not made for Fred and Garret's detention.  They further allege that because Sheriff Olsen testified that each of these was a violation of jail policy, but they occurred, Sheriff Olsen must have failed to appropriately train the corrections officers, which failure to train evinces deliberate indifference.

Fred and Garret's claims for deliberate indifference fail because the record is devoid of facts that would allow a reasonable jury to conclude that Sheriff Olsen had subjective knowledge of the risk that they would be subject to the conditions they complain of.  For example, Fred and Garret present no evidence that Sheriff Olsen knew legal mail was being opened at the jail.  The likewise fail to meet their burden with respect to his knowledge of tazer and pepper spray use against inmates in ways they claim were unconstitutional. Similarly, there are no facts in the record that suggest Sheriff Olsen knew corrections officers were taunting prisoners with sexual comments about their loved ones, and there is no indication from the undisputed facts that Sheriff Olsen knew about the other failings at the jail, such as the leaking toilet.  Without evidence of Sheriff Olsen's subjective knowledge of these issues, Fred and Garret cannot meet their burden of showing that qualified immunity does not apply—i.e. of showing that the conduct they complain of violated a clearly established constitutional right.[12]  Thus, the Court finds that Sheriff Olsen is protected from suit for the conditions of confinement at the Dale County Detention Facility by the doctrine

---

[12]Because the Court has no information about Sheriff Olsen's subjective knowledge of the alleged unconstitutional conditions, the inquiry does not proceed to whether he ignored the risk by more than mere negligence.

of qualified immunity.[13]  Defendants' Motion for Summary Judgment is therefore due to be granted with respect to all claims against Sheriff Olsen regarding conditions of confinement at the Dale County Detention Facility and those claims are due to be dismissed.

### B. Dale County

In the landmark case of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities—a term which encompasses Dale County—are subject to suits for damages under § 1983.   In making this finding, the Court held that municipalities are not entitled to Eleventh Amendment immunity or qualified immunity. *See Owen v. City of Independence*, 445 U.S. 622 (1980). Qualifying its holding somewhat, the Supreme Court made clear that a county may not be held liable for a § 1983 violation unless the county has a policy or custom which caused the constitutional deprivation: "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.  Accordingly, for § 1983 liability to attach in this case, there must be a causal connection between the county's responsibilities and the injuries complained of. *See id.* at 690. The causation requirement is met if the municipal policy is the moving force of the constitutional violation. *See id.* at 694.  The Eleventh Circuit, sitting *en banc*, applied this standard in the context of prison condition litigation in *Turquitt v. Jefferson County, Ala.*, 137

---

[13]The Court notes that the qualified immunity inquiry is separate and apart from a consideration of the merits of Plaintiff's claims.

F.3d 1285, 1291 (11th Cir. 1998).  There, the Circuit held that a county in Alabama "cannot be liable for the harms that befall jail inmates due to improper operation of the jail or negligent supervision of its inmates because the County has no responsibility in that area." *See also Ex parte Sumpter County*, 953 So. 2d 1235, 1239 (Ala. 2006) (holding that a county in Alabama cannot be liable for administration or operation of county jails because the local sheriff bears that responsibility under Alabama law).  Thus, municipalities' liability in this area is limited to constitutional deprivations that result from underfunding, and courts must carefully distinguish between claims that assert failures of administration and operation from those that assert failures of funding.  *See Turquitt*, 137 F.3d at 1291.  Fred and Garret point to two of their many complaints about the jail conditions as resulting from inadequate funding: (1) poor food, and (2) failure to hire a nurse, which resulted in misplaced and irregularly delivered medicine.   Neither of these inadequacies violate the Fourteenth Amendment.

### 1. Food

The Constitution requires that prisoners be provided "reasonably adequate food." *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985); *see also Farmer*, 511 U.S. at 832 (holding that the Eighth Amendment requires provision of "humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'").  A well-balanced meal, containing sufficient nutritional value to preserve health, is all that is required. *Hamm*, 774 F.2d at 1575.  Dale County has a constitutional obligation

to provide funding for food that meets these requirements. *See Turquitt*, 137 F.3d at 1291.

According to these standards, Fred and Garret's complaints about the food in the Dale County Detention Facility do not rise to the level of an constitutional violation because they do not state an objectively serious deprivation.  They complain that Dale County deprived the jail of adequate funding and that, as a result, the jail served them cold bologna, boiled eggs, and hardened grits.   The fact that food is served cold does not amount to a constitutional violation. *Hamm*, 774 F.2d at 1575.  Nor does an unvaried, but reasonably well-balanced—the complained-of menu provides protein, fat, and carbohydrates—menu traverse the constitutional standard. *See Chandler v. Crosby*, 379 F.3d 1278, 1289-90 (11th Cir. 2004).  While the food and drink paid for by Dale County and served to Fred and Garret would displease a discerning epicurean, all the Constitution requires is what Dale County paid for: reasonably adequate food sufficient to maintain the health of the inmates.  Having determined the menu satisfies the objective consideration the Court need not consider the subjective one.

### 2. Medical Care

Dale County has a constitutional obligation to provide funding for adequate medical care for inmates. *Estelle v. Gamble,* 429 U.S. 97 (1976); *Danley v. Allen*, 540 F.3d 1298, *see also Farmer*, 511 U.S. at 832 (holding that the Eighth Amendment requires provision of "humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'").  Deliberate indifference to a prisoner's serious

37

medical needs violates the Eighth Amendment. *Danley*, 540 F.3d at 1310 (citing *Goebert*, 510 F.3d at 1326).  Under the Fourteenth Amendment, pretrial detainees are afforded the same protection. *See id.* To prove a deliberate indifference claim, a plaintiff must show: (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiffs injury. *Id.*  Fred and Garret complaint that because Dale County refused to adequately fund the jail, there was no nurse on staff, and, as a further consequence, trusties irregularly delivered their medications to them in violation of jail policy.

Fred and Garret suffered a "serious medical need" because one test for such a need in this Circuit is whether the condition "is one that has been diagnosed as a physician as mandating treatment." *Danley*, 540 F.3d at 1310-11.  But there are several reasons Dale County cannot be liable for mistreatment of Fred and Garret, the seriousness of their medical conditions notwithstanding.  First, there is no support for the proposition that the occasional failure of trusties to deliver prescription medication was "so obvious" that Dale County "can reasonably be said to have been deliberately indifferent to the need." *See City of Canton v. Harris*, 489 U.S. 378, 396 (1989).  Occasional failures of this sort are likely to have gone unnoticed to Dale County, which was not responsible for supervision of either the jailers or the inmates, which raises a second point. Dale County "cannot be liable for the harms that befall jail inmates due to improper operation of the jail or negligent supervision of its inmates because the County has no responsibility in that area." *Turquitt*, 137 F.3d 1291.  Fred and Garret explicitly argue that the delivery of medication by trusties was a violation of jail

38

policy.   Hence, they seek to saddle Dale County with liability for failures of jail administration, which is impermissible under binding precedent.   Finally, and related to the last point, there is no evidence in the record to suggest that the complained-of medical care at the Dale County Detention Facility was a result of inadequate funding; rather, the allegations appear to blame the failures on inadequate supervision and operation, which is Sheriff Olsen's bailiwick.   *See Monell*, 436 U.S. at 690-94.   Therefore, the Motion for Summary Judgment is due to be granted as to all conditions of confinement claims against Dale County and those claims are due to be dismissed.

## VI. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED as follows:

(1) the Motion to Strike (Doc. # 53) is GRANTED.

(2) the Motion for Summary Judgment (Doc. # 51) is GRANTED.

(3) All claims against all defendants are DISMISSED with prejudice. The Court will enter judgment.

Done this 18th day of August, 2009.

/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE
